## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1] | Case No. 17-12560 (JKS) |
| | (Jointly Administered) |
| Remaining Debtors. | |
| MICHAEL GOLDBERG, in his capacity as Liquidating Trustee of the WOODBRIDGE LIQUIDATION TRUST, | |
| Plaintiff, | Adversary Proceeding No. 19-51050 (JKS) |
| v. | |
| ASCENSUS, LLC d/b/a PROVIDENT TRUST GROUP, ADMINISTRATOR AND CUSTODIAN FOR THE BENEFIT OF CHRISTOPHER M. SOULIER ROTH IRA; CHRISTOPHER M. SOULIER, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Jason S. Pomerantz (admitted *pro hac vice*)
Jeffrey P. Nolan (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100

*Counsel for Plaintiff*

---

[1] The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172). The Remaining Debtors' mailing address is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423.

# TABLE OF CONTENTS

I.      NATURE AND STATUS OF PROCEEDING ...................................................................1

II.     SUMMARY OF ARGUMENT .........................................................................................2

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................5

        A.      The Chapter 11 Cases .....................................................................................5

        B.      The Ponzi Scheme............................................................................................6

                1.      Overview of the Ponzi Scheme................................................................6

                2.      Ponzi Scheme Findings by this Court and the District Court ....................9

        C.      Defendant's Role in and Compensation from the Ponzi Scheme ........................10

        D.      The Debtors' and Defendant's Securities Law Violations ..................................11

        E.      Pleadings and Discovery in the Adversary Proceeding ........................................12

IV.     ARGUMENT .................................................................................................................13

        A.      Summary Judgment Standard ...............................................................................13

        B.      Second and Fourth Claims for Relief:  The Transfers Were Actual Intent
                Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code
                and California Civil Code § 3439.04(a)(1)............................................................14

                1.      Defendant Received Transfers from the Debtors.......................................15

                2.      The Transfers Were Made with Actual Intent to Hinder, Delay, or
                        Defraud Creditors....................................................................................15

                3.      Defendant Has No Defense Under Section 548(c) of the
                        Bankruptcy Code or California Civil Code § 3439.08(a)..........................22

        C.      Third and Fifth Claims for Relief:  The Transfers Were Constructive
                Fraudulent Transfers Under Section 548(a)(1)(B) of the Bankruptcy Code
                and California Civil Code § 3439.05(a)................................................................24

        D.      Sixth Claim for Relief: The Claims of Defendant Must Be Disallowed ...............26

V.      CONCLUSION................................................................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aghaian v. Minassian*,
    59 Cal. App. 5th 447, 455 n.8 (2020) ................................................................. 15

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
    842 F. Supp. 2d 1216, 1224 (C.D. Cal. 2012) .................................................... 20

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 248 (1986) .................................................................................. 13

*Arizona v. California*,
    460 U.S. 605, 618 (1983) .................................................................................. 18

*Bell v. Disner*,
    No. 3:14CV91, 2016 U.S. Dist. LEXIS 164368, at *37 (W.D.N.C. Nov. 29, 2016) ........ 21, 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 323 (1986) .................................................................................. 13

*Cf. Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800, 815–16 (1988) ............................................................................ 18

*Devex Corp. v. Gen. Motors Corp.*,
    857 F.2d 197, 199 (3d Cir. 1988) ..................................................................... 18

*Filip v. Bucurencui*,
    129 Cal. App. 4th 825, 834 (2005) .................................................................... 19

*In re Acequia, Inc.*,
    34 F.3d 800 (9th Cir. 1994) .............................................................................. 14

*In re AFI Holding, Inc.*,
    525 F.3d 700, 704 (9th Cir. 2008) .................................................................... 18

*In re Bayou Grp., LLC*,
    439 B.R. 284, 304 (S.D.N.Y. 2010) ........................................................... 16, 23

*In re Bernard L. Madoff Inv. Sec. LLC*,
    2011 U.S. Dist. LEXIS 97647, at *12 (S.D.N.Y. Aug. 31, 2011) .................. 16, 17

*In re Cohen*,
    199 B.R. 709, 716 (B.A.P. 9th Cir. 1996) ........................................... 15, 16, 23, 24

*In re DBSI, Inc.*,
    477 B.R. 504, 510–11 (Bankr. D. Del. 2012) ................................................... 16

*In re EPD Inv. Co.*,
    — F. 4th —, 2024 U.S. App LEXIS 21363, at *16 (9th Cir. Aug. 23, 2024) ......... 16

*In re Ezra*,
    537 B.R. 924, 930 (B.A.P. 9th Cir. 2015) ........................................................ 19

*In re Garoian*,
    2014 Bankr. LEXIS 5254, at *70 (Bankr. C.D. Cal. Oct. 7, 2014) ..................... 16

*In re Imperial Corp. of Am.*,
    No. 92-1003-IEG (LSP), 1997 U.S. Dist. LEXIS 20943, at *8 (S.D. Cal. Aug. 12, 1997)...... 23

*In re Manhattan Inv. Fund Ltd.*,
    397 B.R. 1, 7, 9–11 (S.D.N.Y. 2007) .......................................................... 16, 17

*In re Pringle*,
    495 B.R. 447, 467 (B.A.P. 9th Cir. 2013) ........................................................ 19

*In re Randy*,
189 B.R. 425, 438 (Bankr. N.D. Ill. 1995) ....................................................... 17, 21
*In re Resyn Corp.*,
945 F.2d 1279, 1281 (3d Cir. 1991).................................................................... 18
*In re Rodriguez*,
209 B.R. 424, 434 (Bankr. S.D. Tex. 1997) ...................................................... 21, 25
*In re Tribune Co. Fraudulent Conveyance Litig.*,
No. 11-md-2296 (RJS), 2017 U.S. Dist. LEXIS 3039, at *33 (S.D.N.Y. Jan. 6, 2017).......... 20
*In re Woodbridge Grp. of Cos., LLC*,
592 B.R. 761, 764 (Bankr. D. Del. 2018) ............................................................ 9
*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
712 F.3d 185, 196 (5th Cir. 2013) .................................................................... 21
*Janvey v. Gold Channel, Inc.*,
792 F.3d 539, 546 (5th Cir. 2015) .................................................................... 20
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574, 587 (1986)............................................................................... 13
*Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*,
926 F.2d 1248, 1254–55 (1st Cir. 1991)........................................................... 20
*Moran v. Goldfarb*,
No. 09 Civ. 7667 (RJS), 2012 U.S. Dist. LEXIS 100491, at *11–12 (S.D.N.Y. July 16, 2012)
............................................................................................................... 18
*Perkins v. Haines*,
661 F.3d 623, 626 (11th Cir. 2011) .................................................................. 16
*Schneider v. Barnard*,
508 B.R. 533, 551 (E.D.N.Y. 2014) .................................................................. 23
*Scholes v. Lehman*,
56 F.3d 750, 762–63 (7th Cir. 1995) ................................................................ 18
*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015)........................................................ 17, 20
*Travelers Indem. Co. v. Bailey*,
557 U.S. 137, 150 (2009)............................................................................... 18
*U.S. ex rel. Anderson v. N. Telecom, Inc.*,
52 F.3d 810, 815 (9th Cir. 1995) .................................................................... 13
*United States of America v. Robert Shapiro*,
Case No. 19-cr-20178-CMA............................................................................ 9
*United Student Aid Funds, Inc. v. Espinosa*,
559 U.S. 260, 276 (2010).............................................................................. 18
*Warfield v. Byron*,
436 F.3d 551, 560 (5th Cir. 2006)................................................................... 21, 25
*Wiand v. Lee*,
753 F.3d 1194, 1201 (11th Cir. 2014) .............................................................. 21

**Federal Cases**
*In re Agric. Research & Tech. Grp., Inc.*,
916 F.2d 528, 535–36 (9th Cir. 1990) .............................................................. 24

**Statutes**
11 U.S.C. § 101(54)(D)................................................................................... 15

11 U.S.C. § 544 ............................................................................................ 17

11 U.S.C. § 544(b) ....................................................................................... 14

11 U.S.C. § 548 .............................................................................. 14, 16, 17

11 U.S.C. § 548(a)(1) ................................................................................... 22

11 U.S.C. § 548(a)(1)(B)(ii) ........................................................................ 25

11 U.S.C. § 548(c) .............................................................................. passim

11 U.S.C. §548(a)(1)(A) ..................................................... 2, 14, 15, 19

11 U.S.C. §548(a)(1)(B) ................................................. 2, 24, 25, 26

Cal. Civ. Code § 3439 .................................................................................. 14

Cal. Civ. Code § 3439.01(m) ..................................................................... 15

Cal. Civ. Code § 3439.02(b) ....................................................................... 25

Cal. Civ. Code § 3439.04(a) ............................................................... 14, 19

Cal. Civ. Code § 3439.04(b) ....................................................................... 19

Cal. Civ. Code § 3439.04(b)(7) ................................................................. 22

Cal. Civ. Code § 3439.05 .................................................................... 25, 26

Cal. Civ. Code § 3439.09 ............................................................................ 14

Cal. Civ. Code § 3439.09(a) ....................................................................... 14

Cal. Civ. Code § 3439.14 ............................................................................ 14

California Civil Code § 3439.04(a)(1) ................................ 2, 14, 15, 22

California Civil Code § 3439.04(a)(2) ...................................... 2, 26

California Civil Code § 3439.05(a) ........................................................... 24

California Civil Code § 3439.08(a) ........................................................... 22

Fed. R. Civ. P. §56(a) ................................................................................... 13

Michael Goldberg, in his capacity as Liquidating Trustee ("Plaintiff" or the "Liquidating Trustee") of the Woodbridge Liquidation Trust (the "Liquidation Trust"), submits this memorandum of law in support of his motion for partial summary judgment (the "Motion"). In addition to this memorandum, Plaintiff has concurrently filed a Request for Judicial Notice (the "RJN") and the declarations of Nicholas R. Troszak (the "Troszak Declaration"), and Bradley D. Sharp (the "Supplemental Sharp Declaration"),[1] in support of the Motion.

## I. NATURE AND STATUS OF PROCEEDING

1. Plaintiff is the authorized representative of the Liquidation Trust and has the authority and right "to carry out and implement all applicable provisions of the Plan," and to act for the Liquidation Trust in exercising its "exclusive right, power, and interest . . . to institute, commence, file, pursue, [and] prosecute . . . all Liquidation Trust Actions." *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Bankr. D.I. 2397][2] (the "Plan") §§ 5.4.5, 5.4.15.

2. The overwhelming majority of the beneficiaries of the Liquidation Trust are the victims of a massive Ponzi scheme, the collapse of which precipitated the above-captioned chapter 11 cases (the "Chapter 11 Cases"). On November 27, 2019, the Liquidating Trustee commenced this adversary proceeding by filing the *Complaint Objecting to Claims and Counterclaiming for Avoidance and Recovery of Avoidable Transfers, for Equitable Subordination, for Sale of Unregistered Securities, Fraud, and for Aiding and Abetting Fraud* (Adv. D.I. 1) (the "Complaint").

---

[1] The term "Supplemental Sharp Declaration" refers to the concurrently filed declaration of Mr. Sharp, who also submitted a declaration in connection with the confirmation hearing on the Plan (as defined below). *See* Bankr. D.I. 2829. The latter declaration is referred to herein as the "Sharp Declaration" and is attached as Exhibit A to the Supplemental Sharp Declaration}.

[2] Citations to "Bankr. D.I. __" refer to docket entries in the lead bankruptcy case, *In re Woodbridge Group of Companies, LLC*, No. 17-12560 (JKS). Citations to "Adv. D.I. __" refer to docket entries in the above-captioned adversary proceeding.

3.      Christopher M. Soulier, ("<u>Defendant</u>") was a broker who marketed and sold the Debtors'[3] fraudulent investment products.   The Complaint seeks to:   (i) avoid and recover commissions, royalties, kickbacks, and monies paid by the Debtors to Defendant on the grounds that such payments were fraudulent transfers (Second, Third, Fourth, and Fifth Claims for Relief).

4.      Fact discovery in this adversary proceeding closed on August 30, 2024.   *See* Adv. D.I. 46 (Scheduling Order) ¶ 3.   Discovery confirmed that there is no genuine issue of material fact as to the following claims asserted in the Complaint, which are now ripe for summary judgment in Plaintiff's favor:

- **Second and Fourth Claims for Relief**:  Avoidance and recovery of actual intent fraudulent transfers under section 548(a)(1)(A) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and California Civil Code § 3439.04(a)(1), respectively.

- **Third and Fifth Claims for Relief**:  Avoidance and recovery of constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code and California Civil Code § 3439.04(a)(2), respectively.

- **Sixth Claim for Relief**:  Disallowance of Defendant's Claims.

## II.  <u>SUMMARY OF ARGUMENT</u>[4]

5.      The Debtors, under the control of Robert Shapiro ("<u>Shapiro</u>"), operated a massive Ponzi scheme, raising more than $1 billion from thousands of investors nationwide.  The Securities and Exchange Commission (the "<u>SEC</u>") conducted an extensive investigation that ultimately established the existence of a Ponzi scheme.  Criminal charges were subsequently filed against Shapiro in federal district court.  Shapiro entered a guilty plea and admitted to the fraudulent scheme.  This Court found and determined (as part of a contested Plan confirmation process) that

---

[3]     The term "<u>Debtors</u>" refers to Woodbridge Group of Companies, LLC and its affiliated debtors in the Chapter 11 Cases.

[4]     All facts referenced in this Summary of Argument are set forth in greater detail, with citations to the record, in Section III, *infra*.

the Debtors were operated as a Ponzi scheme. It has thus been conclusively determined as a matter of law that the Debtors operated a Ponzi scheme between (at least) 2012 and 2017.

6.     Defendant acted as a broker outside the offices of the Debtors. He was responsible for originating securities called First Position Commercial Mortgages ("FPCMs") (also referred to as "Notes"). Defendant received commissions or brokerage fees for promoting, soliciting, or selling these fraudulent investments (i.e., the Transfers, as defined below). Defendant also invested in the securities. This Motion aims to recover those Transfers for the beneficiaries of the Liquidation Trust. There is no genuine dispute that the Transfers are avoidable and recoverable on multiple grounds.

7.     *First*, the Transfers are textbook examples of actual intent fraudulent transfers (Second and Fourth Claims for Relief). *See* Part IV.B, *infra*. It is settled law that the existence of a Ponzi scheme is sufficient to establish actual intent to hinder, delay, or defraud creditors. This Court has already found that the Debtors were part of a Ponzi scheme. Defendant has not disputed and cannot dispute that the Transfers to Defendant (i.e., commission payments for recruiting new Ponzi scheme victims) were made in connection with the Ponzi scheme. The Liquidating Trustee is thus entitled to summary judgment on his claims that the Transfers are avoidable as actual intent fraudulent transfers under the Bankruptcy Code and state law.[5]

8.     *Second*, the Transfers are avoidable as constructive fraudulent transfers (Third and Fifth Claims for Relief). *See* Part IV.C, *infra*. The Debtors were insolvent at all relevant times because, as a Ponzi scheme, they had no ability to repay their debts as they came due (except by fraudulently recruiting new investors to the scheme). The Debtors received no value—let alone

---

[5]     Although the Ponzi scheme presumption, standing alone, is sufficient to establish actual intent, the undisputed facts also establish a confluence of "badges of fraud"—an additional basis for Defendant's liability on Plaintiff's actual intent fraudulent transfer claims. *See* Part IV.B.2(b), *infra*.

reasonably equivalent value—for the Transfers because each new investment solicited by Defendant increased the Debtors' liabilities and ultimately left them unable to satisfy their aggregate liabilities.

9.      To the extent Defendant asserts an affirmative defense to the fraudulent transfer claims under section 548(c) of the Bankruptcy Code or analogous state law, it is ***Defendant's*** burden to prove that he received the Transfers for value and in good faith.  There is no such evidence in the record.  Nor could Defendant possibly establish this defense under any set of facts because, as a matter of law, the recruitment of more victims to the Ponzi scheme did not provide "value" to the Debtors.  *See* Part IV.B.3, *infra*.  Because Defendant provided no value, the Court need not consider whether there is a genuine issue of material fact as to Defendant's good faith (or lack thereof).  But even if the Court is inclined to consider this element of Defendant's defense, the evidence in the record undisputedly establishes a lack of good faith.

10.     In short, the Liquidating Trustee asserts valid fraudulent transfer claims to which Defendant has no defense.  The Court should grant summary judgment in the Liquidating Trustee's favor on the Second, Third, Fourth, and Fifth Claims for Relief.[6]  The relief sought in Plaintiff's Sixth Claim For Relief (disallowance of Defendant's Claims) is also mandated.  *See* Part IV.G, *infra*.  As an individual who helped further and promote the Ponzi scheme, Defendant's Claims for commissions and related compensation are not enforceable under applicable non-bankruptcy law, and thus subject to disallowance under Bankruptcy Code section 502(b).  Even were that not

---

[6]    The Liquidating Trustee seeks prejudgment interest on the Transfers (as defined herein).  *Cf.* Compl., Prayer for Relief ¶ 9 (requesting prejudgment interest).  The Liquidating Trustee suggests that the Court defer consideration of the prejudgment interest calculation until entry of a final judgment.  In the event the Court desires supplemental briefing or evidence on Plaintiff's entitlement to prejudgment interest or the calculation thereof, Plaintiff will submit such briefing or evidence as requested by the Court.

the case, Defendant's Claims are automatically disallowed under the Bankruptcy Code unless and until all avoided sums are fully repaid. *See* 11 U.S.C. § 502(d).

11. This litigation has been ongoing since 2019. Fact discovery is closed. Defendant has had ample opportunity to dispute the facts supporting the Liquidating Trustee's claims. The Motion is ripe for determination. For these reasons, and as set forth more fully herein, partial summary judgment should be granted in favor of Plaintiff.

### III. <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

**A.    The Chapter 11 Cases**

12. On December 4, 2017 (the "<u>Initial Petition Date</u>"), Woodbridge Group of Companies, LLC and certain of its affiliates commenced voluntary cases under chapter 11 of the Bankruptcy Code. Other Debtors also filed voluntary chapter 11 cases within the following four months (each such date, including the Initial Petition Date, a "<u>Petition Date</u>").

13. On January 23, 2018, the Court entered an order approving a joint resolution among the Debtors, the unsecured creditors' committee, two ad hoc committees, and the SEC, which, *inter alia*: (i) provided for the Debtors' board of managers to be replaced with a new, independent board (the "<u>New Board</u>"); and (ii) authorized the New Board to select a new Chief Restructuring Officer or Chief Executive Officer. *See* Bankr. D.I. 357. Under the direction of the New Board and with the approval of this Court, the Debtors designated Bradley Sharp of Development Specialists, Inc. as their Chief Restructuring Officer. *See* Bankr. D.I. 512, 573.

14. On August 22, 2018, the Debtors, under the direction of the New Board and independent management, filed the Plan and an accompanying disclosure statement. *See* Bankr. D.I. 2397 (Plan) & 2398 (the "<u>Disclosure Statement</u>"). The Plan provided for the liquidation of the Debtors and their assets, which consisted largely of: (i) 189 real properties; (ii) cash; and (iii) the "Liquidation Trust Actions" (as defined in the Plan). *See* Disclosure Statement at 6. The

Plan also provided for the creation of a Liquidation Trust, the purpose of which is to, among other things, prosecute litigation and make distributions to legitimate creditors. *See generally* Plan § 5.4.4.

15.     On October 24, 2018, the Court held a contested confirmation hearing on the Plan. *See* Bankr. D.I. 2888 ("hearing transcript"). The Court took evidence submitted by the parties, including from the Debtors in the form of the declarations of Sharp, Chief Restructuring Officer of WGC Independent Manager LLC,; Soneet R. Kapila, who was retained by the SEC to conduct a forensic accounting investigation of certain Woodbridge entities; and Frederick Chin, the Chief Executive Officer of WGC Independent Manager LLC (the sole manager of the Debtors). *See* Bankr. D.I. 2829, 2833, 2834. The Court also heard live testimony from Messrs. Sharp and Kapila, including cross-examination by counsel for creditors opposed to the Plan. *See* Bankr. D.I. 2888 at 32:1–55:9.

16.     On October 26, 2018, the Court entered an order confirming the Plan. Bankr. D.I. 2903 (the "Confirmation Order").[7]

## B.     The Ponzi Scheme

### 1.     Overview of the Ponzi Scheme

17.     From August 2012 through December 1, 2017, the Debtors raised more than $1 billion from over 10,000 unsuspecting investors nationwide by selling those investors two primary products, five-year "Units" and twelve- to eighteen-month "Notes." Bankr. D.I. 2829 (Sharp Decl.) ¶ 21. Repayment of both Units and Notes, the Debtors represented, would be based on the purported revenues the Debtors would receive from issuing short-term loans to unrelated third-party property owners. *Id.* ¶ 22. As marketed by the prepetition Debtors, the Debtors would

---

[7]     A copy of the Confirmation Order is attached to the RJN as Exhibit A.

make short-term loans, between $1 million and $100 million, to bona-fide third-party borrowers at high rates of interest (approximately 11%–15%), secured by first-position mortgages on real properties owned by the borrowers. *Id.* These loans to third parties would supposedly be provided at loan-to-value ratios of approximately 60%–70%. *Id.* The result, according to the sales pitch, would be a robust, safe cash-flow stream that would provide revenues for the Debtors to repay the Units and the Notes. *Id.*

18.    In reality, there was no robust and safe cash-flow stream from third-party borrowers, as a very small fraction of investor money flowed from the Debtors to unrelated third parties. *Id.* ¶ 23. Rather, Shapiro created disguised affiliates to which money was loaned, and which sometimes (but not always) purchased real estate assets with the funds. *Id.* ¶¶ 13, 23. These "borrowers" did not even have bank accounts and had no ability to service the required interest payments on an ongoing basis. *Id.* In addition, they had no ability to retire the debt when due, other than through the sale of the underlying property, which does not appear to have been contemplated and was not frequently effectuated. *Id.*

19.    With regard to sales of real property, the annual cash flow from such sales (which sales were not frequent) was just a small fraction of the amount of principal and interest paid to investors. *Id.* ¶ 24. For example, in 2016—the last full calendar year before the Initial Petition Date—$138.2 million in principal and interest payments were made to investors, even though the net proceeds of real property sales were only $28.4 million. *Id.* These figures demonstrate that property sales were "grossly insufficient" to cover payments of principal and interest, and there was no other material source of revenue to make such payments other than from the sale of additional Notes and Units. *Id.*

20.     Accordingly, instead of using legitimate business proceeds, the prepetition Debtors used funds received primarily from new investors to make payments to old investors. *Id.* ¶ 25. Over the course of the scheme, the prepetition Debtors, which Shapiro controlled, paid hundreds of millions of dollars of "interest" and "principal" to existing investors, primarily from funds received from new investors. *Id.* Shapiro also caused the Debtors to use commingled investor money to pay approximately $80 million in commissions, primarily to sales agents who sold these fraudulent "investments." *Id.*

21.     Moreover, investments were solicited, and payments of "interest" were made to existing investors, without regard to whether the real property supposedly underlying the investment realized value (or even existed). *Id.* ¶ 26. For example, on certain occasions, Shapiro issued Notes in respect of properties that the Debtors never actually acquired. *Id.* Nevertheless, investments were solicited from investors, and liens and security interests were purportedly granted to the Debtors, to secure "loans" relating to such properties. *Id.*

22.     In late 2017, Shapiro's fraudulent scheme unraveled. *Id.* ¶ 27. As federal and state investigations intensified and unfavorable press reports began to emerge, the prepetition Debtors found it increasingly difficult to raise new capital from investors. *Id.* As noted above, the prepetition Debtors were reliant on funds from new investors to make the payments promised to existing Unitholders and Noteholders. *Id.* When new investment dried up, the inability to make required Notes and Units servicing payments became inevitable; indeed, the prepetition Debtors were unable to make the December 1, 2017 interest and principal payments due on the Notes, which quickly precipitated the filing of the initial Debtors' bankruptcy cases on the Initial Petition Date. *Id.*

## 2. Ponzi Scheme Findings by this Court and the District Court

23.     In its published opinion on Plan confirmation, this Court found that the Chapter 11 Cases "arise out of a massive, multi-year fraudulent scheme perpetrated by Robert Shapiro between (at least) 2012 and 2017." *See In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 764 (Bankr. D. Del. 2018). "As part of this fraud, through the Woodbridge entities, Shapiro raised over one billion dollars from approximately 10,000 investors—as either Noteholder[s] or Unitholders—and used approximately $368 million of new investor funds to pay existing investors—a typical characteristic of Ponzi schemes." *Id.* at 765. The Court made numerous detailed findings of fact and ultimately concluded "that the Debtors were operated as a Ponzi scheme." *Id.* at 771.

24.     Moreover, in the Confirmation Order, the Court made specific factual findings regarding the existence of the Ponzi scheme:

> The evidence demonstrates, and the Bankruptcy Court hereby finds, that (i) beginning no later than July 2012 through December l, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered no later than December 2017.

(RJN, Confirmation Order ¶ NN).

25.     On October 15, 2019, Robert Shapiro's sentencing hearing (the "Sentencing Hearing") took place in the matter captioned *United States of America v. Robert Shapiro*, Case No. 19-cr-20178-CMA, in the United States District Court for the Southern District of Florida, the Honorable Cecilia M. Altonaga presiding (the "District Court"). Shapiro spoke at the Sentencing Hearing, referencing his guilty plea and expressing remorse for his role in the Ponzi scheme. *See* Oct. 15, 2019 Hr'g Tr. ("Sent. Hrg. Tr.") (RJN, Ex. B) at 98:12–21. In his stipulated factual proffer

in connection with his plea agreement, Shapiro stipulated, *inter alia*, that (i) "[c]ontrary to representations to investors, [his] real estate portfolio failed to generate sufficient cash flow, so the Shapiro-controlled properties were unable to satisfy the loan obligations and interest payments owed to Woodbridge and its investors; (ii) "[t]o make up for the cash deficiency . . . he diverted recently collected investors' funds to pay purported profits to prior investors"; and (iii) "[a]s a result of this improper diversion, hundreds of millions of dollars invested by new investors were misused to pay false and misleading 'returns' to existing Woodbridge investors." RJN, Ex. J (Stipulated Factual Proffer); *see also* RJN, Ex. K (Plea Agreement).

26.     Thomas P. Jeremiassen, a restructuring advisor retained by the Liquidating Trustee, testified at the Sentencing Hearing as an expert witness for the United States regarding the evidence unearthed in the investigation of the Debtors' operations and Shapiro's role in operating a Ponzi scheme. The District Court concluded that Shapiro had engineered a Ponzi scheme: "I think there was the objection to the reference to the Ponzi scheme. There is clearly evidence supporting that what transpired is in the nature of a Ponzi scheme." Sent. Hrg. Tr. at 61:3–6; *see also id.* at 25:18–26:1, 41:18–42:3.

## C.     Defendant's Role in and Compensation from the Ponzi Scheme

27.     Defendant was an outside broker recruited to sell investments. Troszak Decl. ¶ 8. He sold FPCMs, in the form of Notes and Units, as well as other Woodbridge products to investors. *Id.* ¶ 9.

28.     Brokers, including Defendant, sold FPCMs as documented in "senior position packages," as they were sometimes referenced, which included primarily four (4) documents: (a) a Promissory Note in favor of the lender/investor to memorialize the loan; (b) a Form of Assignment; (c) a Form of Collateral Assignment; and (d) a Form of Intercreditor Agreement. *See id.* ¶ 9. Once the Debtors confirmed receipt of investor funds, the Debtors would issue a letter or

email to the broker confirming the investment, which would trigger the commissions purportedly owed to Defendant. *See id.* ¶ 9 & Ex. 2.

29.     As part of selling the securities, brokers forwarded marketing materials to unsuspecting investors, frequently including older investors investing Individual Retirement Account funds. *See id.* ¶ 10 & Ex. 3.  The statements therein were materially false and fraudulent, as the investments were *not* as represented. *See id.*  The Debtors represented that "Woodbridge funds 1-year bridge loans" to property owners, failing to disclose that those "property owners" were the Debtors and their affiliates. *See id.*  The Debtors touted that they supposedly "thoroughly evaluate[d]" and appraised each property and performed a title search in connection with the loans. *Id.*  Each property was represented to "hold[] a low loan-to-value (LTV) ratio." *Id.*  The investments in FPCMs were represented to be "secured" loans, with the Debtors offering investors "assurance that their funds are secured by commercial real estate."  Such representations were made to induce investors to believe they were investing in "protected" investments. *See id.* (referencing the "*How It Works Brochure*").  Investors lost much of their life savings, and even with the efforts of the Liquidation Trust, investors are expected to receive far less than what they invested. *See id.* ¶ 7.

30.     Defendant sold Notes and Units between 2017 and the Initial Petition Date.  In the two years prior to the Initial Petition Date, the commissions paid with respect to the sale of FPCM were $32,330  (the "<u>Two Year Transfers</u>"). *See id.* ¶ 12 & Ex. 4.

**D.     The Debtors' and Defendant's Securities Law Violations**

31.     Throughout the time period Defendant was selling FPCMs, numerous states issued cease-and-desist orders prohibiting the Debtors' securities.

32.     On May 4, 2015, the Commonwealth of Massachusetts and Woodbridge Group of Companies, LLC, *et al.* entered into a Consent Order wherein the Debtors agreed no longer to sell

FPCMs to investors in Massachusetts. (RJN, Ex. C). Woodbridge admitted that it did not maintain separate financial accounts for investors, nor did it segregate funds for payment of obligations to each investor. *Id.* Rather, investors were paid out of a general corporate account, and Woodbridge affiliates frequently paid obligations of the Woodbridge Mortgage Investment Fund. *Id.* The FPCMs were not registered, and investors were not informed of the potential risks associated with these real estate transactions or "hard money loans." *Id.*

33.     Over the next approximately two years, four additional states issued cease-and-desist orders or entered into consent orders with the Debtors related to, *inter alia*, the sale of unregistered securities, the failure of the Debtors' brokers to register with applicable securities agencies, and misrepresentations or misleading statements made in connection with the offer and sale of the securities. (RJN, Ex. D) (July 17, 2015 emergency cease-and-desist order issued by State of Texas Securities Board); (RJN, Ex. E) (October 4, 2016 temporary restraining order issued by the Securities Division of the State of Arizona); (RJN, Ex. F) (April 24, 2017 consent agreement and order between the Commonwealth of Pennsylvania and Woodbridge Structured Funding LLC); (RJN, Ex. G) (August 8, 2017 cease-and-desist notice issued by Michigan Department of Licensing and Regulatory Affairs).

34.     The various state decrees were covered by news organizations, including Law360. *See* Troszak Decl. ¶ 13 & Ex. 5.

**E.     Pleadings and Discovery in the Adversary Proceeding**

35.     On November 27, 2019, Plaintiff initiated this adversary proceeding by filing the Complaint. Defendant filed an letter Answer to the Complaint on December 30, 2019. *See* Adv. D.I. 4. *See* Adv. D.I. 46. A scheduling order was entered on April 10, 2024. Defendant did not participate in mediation. *See* Adv. D.I. 51. Fact discovery closed on August 30, 2024. *See id.* ¶ 3.

# IV. ARGUMENT

## A. Summary Judgment Standard

36.     Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" only if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Id.*

37.     The movant "bears the initial responsibility of informing the . . . court of the basis for its motion" and identifying what "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party carries this burden, the "party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment is properly granted.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

38.     Summary judgment is "'not a disfavored procedural shortcut,' but [rather is] the 'principal tool by which factually insufficient claims or defenses can be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources.'" *U.S. ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995) (brackets omitted) (quoting *Celotex*, 477 U.S. at 323–24, 327).

39.     Here, the Liquidating Trustee seeks partial summary judgment on his Second, Third, Fourth, Fifth Claims, and Sixth Claims for Relief to expedite the close of litigation in an efficient and cost-effective manner.

**B.     Second and Fourth Claims for Relief:  The Transfers Were Actual Intent Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code § 3439.04(a)(1)**

40.     Section 548 of the Bankruptcy Code provides, in relevant part, that a trustee may avoid a transfer of an interest of the debtor in property that was made within two years of the petition date with "actual intent to hinder, delay, or defraud" creditors.  11 U.S.C. § 548(a)(1)(A). The Liquidating Trustee's Second Claim for Relief seeks avoidance of the Two Year Transfers pursuant to section 548.

41.     Section 544(b) of the Bankruptcy Code permits a bankruptcy trustee to avoid any transfer of a debtor's property that would be avoidable by an unsecured creditor under applicable state law.  11 U.S.C. § 544(b).[8]  Here, the applicable state law is the California Uniform Voidable Transactions Act (the "CUVTA"), Cal. Civ. Code §§ 3439–3439.14.  The actual intent fraudulent transfer provision of the CUVTA is substantively identical to its Bankruptcy Code analog.  *See* Cal. Civ. Code § 3439.04(a) (allowing a transfer to be avoided when the debtor acted with "actual intent to hinder, delay, or defraud" any creditor).  The CUVTA, however, provides for a four-year lookback period.  *See* Cal. Civ. Code § 3439.09.  Accordingly, the Fourth Claim for Relief seeks avoidance of the Four Year Transfers under the CUVTA.

---

[8]     The existence of one "triggering" creditor with an allowable claim of any amount will suffice for the purposes of section 544(b) of the Bankruptcy Code.  *See In re Acequia, Inc.*, 34 F.3d 800, 809–10 (9th Cir. 1994).  At least one "triggering" unsecured creditor exists here, thereby enabling the Liquidating Trustee to use California Civil Code §§ 3439.04(a) and 3439.09(a) to avoid and recover transfers made within four years of the Initial Petition Date.  *See* RJN ¶ I (claim of California Franchise Tax Board (Claim No. 04635), asserting claim for unpaid taxes for each year from 2013 through 2017); claim of Provident Trust Group, LLC, FBO James D Helgeson IRA (Claim No. 03764), asserting investor claim related to investment made on or about July 10, 2014).

42.     Under both the Bankruptcy Code and the CUVTA, there is no genuine dispute that the Transfers are avoidable and recoverable as actual intent fraudulent transfers.

## 1.     Defendant Received Transfers from the Debtors

43.     A "transfer" under the Bankruptcy Code is defined as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). California's definition of a "transfer" is nearly the same. *See* Cal. Civ. Code § 3439.01(m) (providing that a "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money").

44.     Here, the record establishes that the payments of monies made to Defendant out of the Debtors' main operating account were "transfers" of the Debtors' property. *See* SOF No. 30[9] (citing Troszak Decl. ¶ 12).

## 2.     The Transfers Were Made with Actual Intent to Hinder, Delay, or Defraud Creditors

45.     The "actual intent" inquiry is the same under section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code § 3439.04(a)(1). *See In re Cohen*, 199 B.R. 709, 716 (B.A.P. 9th Cir. 1996) ("Whether [the debtor's] purchases were actually fraudulent as having been made with actual intent either to hinder or to delay or to defraud creditors is the same under the Bankruptcy Code and UFTA.").[10]    "Whether a conveyance is fraudulent under Section 548(a)(1)(A) is thus determined by reference to the intent of *the debtor-transferor* in making the transfer; 'the state of mind of the *transferee* is irrelevant.'" *In re Bernard L. Madoff Inv. Sec. LLC*,

---

[9]     The "<u>SOF</u>" refers to the Statement of Undisputed Material Facts (Part III of this memorandum).  Citations to "SOF No. __" refer to the numbered paragraphs within the SOF.

[10]     In California, the CUVTA supersedes the Uniform Fraudulent Transfer Act (UFTA).  The CUVTA applies to transfers made or obligations incurred after January 1, 2016.  However, the case law under the UFTA has been consistently applied to the CUVTA. *See Aghaian v. Minassian*, 59 Cal. App. 5th 447, 455 n.8 (2020).

2011 U.S. Dist. LEXIS 97647, at *12 (S.D.N.Y. Aug. 31, 2011) (quoting *In re Bayou Grp., LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010)); *see also In re Garoian*, 2014 Bankr. LEXIS 5254, at *70 (Bankr. C.D. Cal. Oct. 7, 2014) ("In a fraudulent transfer inquiry based on actual intent, the court should focus on the state of mind of the transferor."). "The focus in the inquiry into actual intent is on the state of mind of the debtor." *In re Cohen*, 199 B.R. at 716–17.

a.   **The Ponzi Scheme Presumption Establishes Actual Intent as a Matter of Law**

46.   Courts have consistently held that actual intent is established as a matter of law once it is determined that a transfer was made in connection with a Ponzi scheme. *See, e.g., In re EPD Inv. Co.*, — F. 4th —, 2024 U.S. App LEXIS 21363, at *16 (9th Cir. Aug. 23, 2024) (citation and internal quotation marks omitted) ("If the trustee proves that the debtor operated a Ponzi scheme, the trustee is entitled to the irrebuttable presumption that the debtor transferred money with actual fraudulent intent under section 548. Or, as we have repeatedly put it, the mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud."); *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011) ("With respect to Ponzi schemes, transfers made in furtherance of the scheme are presumed to have been made with the intent to defraud . . . ."); *In re DBSI, Inc.*, 477 B.R. 504, 510–11 (Bankr. D. Del. 2012) (noting the presumption that "all payments made by a debtor in furtherance of a Ponzi scheme are made with actual fraudulent intent"); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 7, 9–11 (S.D.N.Y. 2007) (stating that the existence of a Ponzi scheme "demonstrates 'actual intent' as a matter of law").

47.   Once the existence of a Ponzi scheme has been established, the plaintiff need only show that the transfer in question was "related to or in furtherance of the fraudulent scheme" in order to avoid and recover the transfer as an actual intent fraudulent transfer. *In re DBSI*, 477 B.R. at 511; *see also, e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 471

(Bankr. S.D.N.Y. 2015) ("Once it is determined that a Ponzi scheme exists, all transfers made in furtherance of that Ponzi scheme are presumed to have been made with fraudulent intent.").

48.     Numerous courts have concluded that commission payments to brokers, agents, and the like for bringing investors into a Ponzi scheme are "in furtherance of" the scheme and thus constitute actual intent fraudulent transfers.  For example, in an action to recover commission payments made to an entity that recruited victims to the Madoff Ponzi scheme, Judge Lifland observed, "[w]hile it is conceivable that certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply," commission payments to brokers are "clearly tainted as payments from a Ponzi schemer to an individual to reward them for locating new investors." *In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 330 (S.D.N.Y. 2011) (citation and internal quotation marks omitted); *see also, e.g.*, *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 13 (observing that payments to brokers to "reward" them for bringing in new investors are "clearly tainted"); *In re Randy*, 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995) ("The underlying reasoning that courts have used to find that profits paid in a Ponzi scheme to innocent investors are fraudulent transfers applies equally well to commissions paid to brokers who promoted or aided the investment scheme, whether or not they had any culpable intent.  Therefore, as a matter of law, when brokers are paid commissions for their efforts in promoting a Ponzi scheme, these commissions are fraudulent transfers under §§ 548 and 544 of the Code.").

49.     Here, the Court, after weighing the evidence at a contested confirmation hearing, issued a published opinion concluding that at all relevant times, "the Debtors were operated as a Ponzi scheme." *Woodbridge*, 592 B.R. at 771.  The Confirmation Order similarly included findings of fact and conclusions of law that the Debtors operated as a Ponzi scheme.  *See* SOF No. 24 (quoting Confirmation Order).  The Confirmation Order is a final, non-appealable order.

Defendant received notice of the confirmation hearing and did not object. *See* Bankr. D.I. 2553. This Court's findings and conclusions are binding in this litigation. *See, e.g.*, *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 276 (2010) ("Where, as here, a party is notified of a plan's contents and fails to object to confirmation of the plan before the time for appeal expires, that party has been afforded a full and fair opportunity to litigate, and the party's failure to avail itself of that opportunity will not justify" relief from the confirmation order); *cf. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009) ("We hold that the . . . finality of the Bankruptcy Court's orders following the conclusion of direct review generally stands in the way of challenging the enforceability of the injunction.").[11]

50.     Moreover, the District Court at Shapiro's sentencing hearing issued findings consistent with the findings of this Court. *See* SOF No. 26. Shapiro himself pled guilty and acknowledged his role in the Ponzi scheme. *See* SOF No. 25 (citing Sent. Hrg. Tr. (RJN Ex. B) at 98:12–21 and factual proffer in connection with guilty plea). Courts frequently find that a guilty plea or plea agreement establishes the existence of a Ponzi scheme.[12]

---

[11]    *Cf. Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)) (explaining that under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); *In re Resyn Corp.*, 945 F.2d 1279, 1281 (3d Cir. 1991) (quoting *Devex Corp. v. Gen. Motors Corp.*, 857 F.2d 197, 199 (3d Cir. 1988)) ("The doctrine of the law of the case dictates that 'when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation.'" ).

[12]    *See, e.g.*, *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008) (explaining that the defendant's "plea demonstrates the existence of fraudulent intent and a Ponzi scheme"); *Moran v. Goldfarb*, No. 09 Civ. 7667 (RJS), 2012 U.S. Dist. LEXIS 100491, at *11–12 (S.D.N.Y. July 16, 2012) (granting summary judgment for the plaintiff seeking to recoup fictitious profits from a Ponzi scheme based on the guilty plea of an investment advisor who "admitted under oath to running a Ponzi scheme"); *Scholes v. Lehman*, 56 F.3d 750, 762–63 (7th Cir. 1995) (affirming the district court's reliance on the perpetrator's guilty plea admitting that all money transferred to him came directly or indirectly from the defrauded creditors of the perpetrator's corporations). In *In re Slatkin*, for example, the Ninth Circuit specifically held that "a debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent" and "precludes relitigation of that issue." 525 F.3d 805, 814 (9th Cir. 2008).

51.     Accordingly, there is no genuine dispute that the Debtors were operated as a Ponzi scheme and that the commissions paid to Defendant for his promotion and sale of the Debtors' fraudulent securities were related to and in furtherance of the Ponzi scheme. The Transfers are avoidable pursuant to section 548(a)(1)(A) of the Bankruptcy Code (as to the Two Year Transfers) and California Civil Code § 3439.04(a) (as to the Four Year Transfers).

      **b.**      **The Undisputed "Badges of Fraud" Independently Establish Actual Intent to Defraud**

52.     Although the Court need look no further than the Ponzi scheme presumption to conclude that actual intent exists as a matter of law, the overwhelming and indisputable evidence of "badges of fraud" also establishes actual intent to hinder, delay, or defraud creditors.

53.     It is well-settled that, "[b]ecause direct evidence of intent is rare, courts tend to infer the existence of an intentional fraudulent transfer from the circumstances surrounding the transfer." *In re Pringle*, 495 B.R. 447, 467 (B.A.P. 9th Cir. 2013); *accord In re Ezra*, 537 B.R. 924, 930 (B.A.P. 9th Cir. 2015) ("Because direct evidence regarding the debtor's fraudulent or obstructive intent rarely is available, courts typically infer the debtor's intent from the surrounding circumstances.").

54.     To facilitate this analysis, the CUVTA enumerates eleven non-exclusive "badges of fraud" for courts to consider in deciding whether the requisite intent existed. Cal. Civ. Code § 3439.04(b). "No single factor necessarily is determinative, and no minimum or maximum number of factors dictates a particular outcome." *Ezra*, 537 B.R. at 931. However, the presence of only one or two factors may be enough to support a finding of intentional fraud. *See Filip v. Bucurencui*, 129 Cal. App. 4th 825, 834 (2005) (concluding "[a] finding of actual intent was virtually compelled" despite argument that "only two factors are present"). The existence of several badges of fraud can "constitute conclusive evidence of an actual intent to defraud." *In re*

*Tribune Co. Fraudulent Conveyance Litig.*, No. 11-md-2296 (RJS), 2017 U.S. Dist. LEXIS 3039, at *33 (S.D.N.Y. Jan. 6, 2017) (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)).

55.     The evidence adduced by Plaintiff and set forth herein, which has not been controverted by Defendant, establishes multiple badges of fraud, including the most significant badges: (1) the lack of consideration provided for the Transfers, (2) the Debtors' insolvency throughout the relevant time period, and (3) concealment of facts or assets. *See Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1224 (C.D. Cal. 2012) ("Though solvency and adequacy of consideration are only two of the eleven statutorily enumerated badges of fraud, they are among the most compelling; a transfer made by a solvent entity and for reasonably equivalent value would not normally be expected to disadvantage creditors."); *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 241 (S.D.N.Y. 2021) (affirming a finding of fraudulent intent based on lack of consideration, insolvency, and concealment of facts).

56.     ***Lack of Consideration.***  It cannot be disputed that the Debtors received no value for the Transfers made to Defendant.  By definition, each additional investment into a Ponzi scheme inevitably worsens the debtor's financial condition.  *See, e.g.*, *Janvey v. Gold Channel, Inc.*, 792 F.3d 539, 546 (5th Cir. 2015) ("Given that Ponzi schemes, by definition, create greater liabilities than assets with each subsequent transaction, each new investment in the Stanford Ponzi scheme *decreased* the value of the estate by creating a new liability that the insolvent business could never legitimately repay.").  A broker's solicitation of an additional investor in a Ponzi

4869-7194-3408.4 94811.003

scheme therefore provides no value to the debtor because it can "only exacerbate the harm to the debtor's creditors." *In re Randy*, 189 B.R. at 441.[13]

57.     Under no scenario can Defendant establish that his recruitment of additional victims constituted consideration for the Transfers. This badge of fraud is established.

58.     ***Insolvency.*** Nor can it be reasonably disputed that the Debtors were insolvent at the time each Transfer was made. The income derived from the Debtors' real estate business, i.e., the construction and sale of real properties, was "grossly insufficient" to permit the payment of principal and interest to the investors. *See* SOF No. 18 (citing Sharp Decl. ¶ 24). For every year from 2013 to 2017, the income derived from the sales of real property was well short of the amount required to pay investors their principal and "profits." *See id.* There was no other material source to make payments to investors other than money solicited from new investors recruited by Defendant and other brokers. *See* SOF No. 19 (citing Sharp Decl. ¶ 25). The Debtors were clearly not able to pay their debts as they became due unless they brought in new investors to the fraudulent scheme. This is a hallmark of a Ponzi scheme, and it establishes insolvency as a matter of law. *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) (citation omitted) ("[A] Ponzi scheme is, as a matter of law, insolvent from its inception."); *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014) ("Since Ponzi schemes do not generate profits sufficient to provide their promised returns, but rather use investor money to pay returns, they are insolvent and become more insolvent with each investor payment.").

---

[13]     *See also Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) ("It takes cheek to contend that in exchange for the payments [the broker] received, the . . . Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments."); *In re Rodriguez*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997) ("[a]s a matter of law, the defendant gave no value to the debtors for the commissions attributable to investments made by others" into a Ponzi scheme); *Bell v. Disner*, No. 3:14CV91, 2016 U.S. Dist. LEXIS 164368, at *37 (W.D.N.C. Nov. 29, 2016) ("[C]ourts have routinely and specifically held that there is no value in recruiting new investors to a fraudulent scheme.").

59.    ***Concealment of Assets.***    As set forth in detail in SOF Nos. 17-22, it cannot reasonably be disputed that the Debtors "concealed assets."  Cal. Civ. Code § 3439.04(b)(7).  The Debtors' entire investment pitch rested on the false premise that the Debtors' assets consisted of loans made to bona fide third-party borrowers, which would generate stable cash flow for the Debtors (and, in turn, their investors).  *See* SOF Nos. 17-22.  The Debtors concealed the truth about their assets and "operations" until the Ponzi scheme unraveled.  *Id.*

60.    In sum, independent of the Ponzi scheme presumption, the evidence indisputably establishes that the Debtors possessed the requisite intent to hinder, delay, or defraud creditors under both section 548(a)(1) of the Bankruptcy Code and California Civil Code § 3439.04(a)(1).  The Liquidating Trustee is entitled to summary judgment on his Second and Fourth Claims for Relief.

### 3.    Defendant Has No Defense Under Section 548(c) of the Bankruptcy Code or California Civil Code § 3439.08(a)

61.    Section 548(c) of the Bankruptcy Code creates a defense for an initial transferee of a fraudulent transfer who takes the property in (1) good faith and (2) for value.  *See* 11 U.S.C. § 548(c) ("[A] transferee . . . of such a transfer . . . that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer . . . .").  The CUVTA includes an analogous defense.  *See* Cal. Civ. Code § 3439.08(a) (providing a defense to transferees who took in good faith and for reasonably equivalent value).

62.    Defendant bears the burden of proof on this defense, and thus to defeat the avoidance of a transfer on summary judgment, Defendant must offer affirmative evidence sufficient to create a material issue of fact as to whether he took for value and in good faith.  *See In re Imperial Corp. of Am.*, No. 92-1003-IEG (LSP), 1997 U.S. Dist. LEXIS 20943, at *8 (S.D.

Cal. Aug. 12, 1997) (internal quotation marks omitted) (holding, in a case involving a good-faith defense to a fraudulent transfer, that if the plaintiff-movant demonstrates there is no genuine issue of material fact, "the nonmoving [defendant] must designate specific facts showing there is a genuine issue for trial"); *see also Schneider v. Barnard*, 508 B.R. 533, 551 (E.D.N.Y. 2014) ("Because Bankruptcy Code § 548(c) is an affirmative defense, the transferee bears the burden of establishing all elements of the . . . defense."); *In re Bayou Grp., LLC*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith/value defense provided in Section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense."); *In re Cohen*, 199 B.R. at 718 ("The issue of good faith under [the CUVTA] is a defensive matter as to which the defendants asserting the existence of good faith have the burden of proof.").

63.     Here, Defendant has not established any facts supporting either "good faith" or "value." That ends the inquiry, because Defendant bears the burden on this affirmative defense. But even setting aside Defendant's evidence (or lack thereof), this defense fails as a matter of law; as discussed in Part IV.B.2, *supra*, the recruitment of new investors to a Ponzi scheme does not constitute "value" for purposes of fraudulent transfer statutes.

64.     Because Defendant provided no "value" as a matter of law, the Court need not consider whether Defendant was a "good faith" transferee. *See* 11 U.S.C. 548(c) (providing that "for value" and "in good faith" is a conjunctive test); *see also, e.g.*, *Warfield*, 436 F.3d at 560 (holding that because the broker defendant could not have provided value, "[w]e need not draw a conclusion on good faith"). Regardless, Defendant indisputably did not receive the Transfers in good faith. To determine whether a transfer was in good faith, courts "look to what the transferee objectively 'knew or should have known' . . . rather than examining what the transferee actually

knew from a subjective standpoint." *In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 535–36 (9th Cir. 1990). Good faith is not present "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose." *Id.* at 536. "Facts sufficient to warrant a finding of inquiry notice [under the CUVTA] are also sufficient to defeat the good faith that is essential to the § 548(c) safe harbor." *In re Cohen*, 199 B.R. at 720.

65.     Here, the undisputed facts are that as early as 2015, securities regulators of numerous states flagged Woodbridge Notes and Units as not only unregistered securities, but fraudulent. *See* SOF Nos. 31-34 (citing RJN Exs. C–H). States opined in published decrees that the Notes and Units were not securities, were not secured by specific parcels of real property or collateralized, and did not disclose the Debtors were "pooling investor funds" before collateralization of the investment, essentially rendering all monies commingled property. *See id.* The Consent Decrees issued by the states of Texas and Massachusetts were picked up by news outlets such as Law360 as early as July 2015. *See* SOF No. 34 (citing Troszak Decl. ¶ 13 & Ex. 5). As a person employed by the Debtors to sell their securities, Defendant must have been aware of the various warnings from state securities divisions (and Defendant has offered no evidence to the contrary). Nevertheless, Defendant ignored these red flags and continued to sell the Debtors' securities up until the Petition Date. *See* SOF No. 31-34 (citing Troszak Decl. ¶¶ 12-15).

**C.     Third and Fifth Claims for Relief:  The Transfers Were Constructive Fraudulent Transfers Under Section 548(a)(1)(B) of the Bankruptcy Code and California Civil Code § 3439.05(a)**

66.     The Transfers are also avoidable as constructive fraudulent transfers.  Section 548(a)(1)(B) of the Bankruptcy Code provides that the trustee may avoid any transfer of an interest of the debtor if the debtor (i) "received less than a reasonably equivalent value in exchange for such transfer," and (ii) was insolvent at the time of the transfer or intended to incur debts beyond

its ability to pay as they matured.  11 U.S.C. § 548(a)(1)(B).  The constructive fraudulent transfer section of the CUVTA is substantially similar.  *See* Cal. Civ. Code § 3439.05 (providing that creditors may avoid a transfer "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation").  Under both the Bankruptcy Code and the CUVTA, inability to pay debts as they come due constitutes "insolvency" for purposes of the constructive fraudulent transfer test.  *See* 11 U.S.C. § 548(a)(1)(B)(ii); Cal. Civ. Code § 3439.02(b).

67.     Both constructive fraudulent transfer elements are satisfied here.  ***First***, as discussed in detail in Part IV.B.2, as a matter of law, a broker who receives commissions for bringing new investors into a Ponzi scheme provides ***no value***—let alone reasonably equivalent value—to the debtor.  *See, e.g.*, *Warfield*, 436 F.3d at 560 ("It takes cheek to contend that in exchange for the payments [the broker] received, the . . . Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments."); *In re Rodriguez*, 209 B.R. at 434 (finding "[a]s a matter of law, the defendant gave no value to the debtors for the commissions attributable to investments made by others" into a Ponzi scheme); *Bell*, 2016 U.S. Dist. LEXIS 164368, at *37 ("[C]ourts have routinely and specifically held that there is no value in recruiting new investors to a fraudulent scheme.").

68.     ***Second***, the Debtors were indisputably insolvent from inception of the Ponzi scheme in 2012 through the Petition Date.  It is indisputable that the Debtors could not pay investors from their legitimate existing operations.  *See* SOF No. 19–20 (citing Sharp Decl. ¶¶ 24–25).  Only by taking the principal investments of new investors could the Debtors pay their existing

debts. *Id.* As discussed above, courts have consistently held that Ponzi schemes are, by their very nature, insolvent for purposes of fraudulent transfer law. *See* Part IV.B.2(a).

69.     The evidence thus establishes beyond dispute that the Transfers were constructively fraudulent under both section 548(a)(1)(B) of the Bankruptcy Code and California Civil Code § 3439.04(a)(2). Moreover, for all of the reasons set forth in Part IV.B.2, *supra*, Defendant is not entitled to a "for value and in good faith" defense under Bankruptcy Code section 548(c) or analogous state law. The Liquidating Trustee is entitled to summary judgment on his Third Claim for Relief (avoidance and recovery of the Two Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code) and Fifth Claim for Relief (avoidance and recovery of the Four Year Transfers under California Civil Code § 3439.05).

## D.     Sixth Claim for Relief: The Claims of Defendant Must Be Disallowed

70.     Defendant filed Proof of Claim No. 9459 against the Debtors in the amount of $36,000. The Claim asserts a right to payment for investments in FPCM. The Sixth Claim for Relief in the Complaint objects to and seeks disallowance of the Claim.

71.     The Claim  must be disallowed under Bankruptcy Code section 502(d) because Defendant received—and has not repaid—avoidable transfers. That statute provides:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d). "Accordingly, 'any claim' falling into this category of claims is disallowable until the avoidable transfer is returned." *In re KB Toys Inc.*, 736 F.3d 247, 252 (3d Cir. 2013).

72.     Defendant cannot dispute that the Claim, and any other claims maintained by Defendant, is subject to disallowance under section 502(d) until the avoidable transfer is returned. The Liquidating Trustee is entitled to summary judgment on his Sixth Claim for Relief.

# V. **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the Motion, enter partial summary judgment in substantially the form attached hereto, and grant such other and further relief as the Court deems just and proper.

Dated: October 31, 2024        **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Colin S. Robinson*
Jason S. Pomerantz (CA Bar No. 157216) (pro hac vice)
Jeffrey Nolan (CA Bar No. 158923) (pro hac vice)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: jspomerantz@pszjlaw.com
     jnolan@pszjlaw.com
     crobinson@pszjlaw.com

*Counsel for Plaintiff*